IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PHILIP SHROPSHIRE, )
        Plaintiff, )
        v. ) C.A. No. 2:17-cv-00935-DSC
CHRIS GALLOWAY, ZACHARY )
REIDER and FIELDWORKS LLC, )
        Defendants. )

# Introduction

Since Defendants seem to suggest that everything I say is mere conjecture even when quoting case law or newspaper accounts or their own statements, I thought it might be helpful to introduce a statement of material facts, with affidavits when possible.

## STATEMENT OF MATERIAL FACTS

1. I started work at Fieldworks at or around June 1st, 2016. I was probably the most experienced canvasser in that office in that I had done every kind of political canvassing imagined, from political contacts and persuasion to door to door fundraising. I've estimated that I have knocked on over 60000 doors since 1982 in several states. (See resume or exhibit one.)

2. Fieldworks has been around since at least 2004 and they primarily do work for liberal organizations. If you go to their website online:

http://www.fieldworks.com/clients/

You will find that they list as clients: The AFL CIO, Planned Parenthood, The California Democratic Party, The Democratic Party, AFSCME, Maryland NARAL, Hillary Clinton for President and many other liberal organizations.

(Exhibit two online list of clients.)

3. I was one of the first persons hired and I was immediately promoted within several weeks to field manager, which also meant that my pay increased to 15 dollars an hour. During the entirety of my tenure at Fieldwork I was never criticized about my work. In fact, when our canvass director was black I was praised for my work. He said this about my tenure when we were talking on Facebook. (see exhibit 3: Joel Williams praises me on Facebook.)

4. The last time I checked my numbers I was averaging about 20 voter registrations per day. My nickname was "The Downtown Assassin". I wish I could say I was charismatic or good looking and that's why I got my numbers but those wouldn't be facts. I just asked as many people as I could in a 6 hour canvass. That was usually 100 to 200 people per day. (See Philip Shropshire Declaration for Justin Everett, or exhibit five)

5. After watching someone attempt to train a new person and then watching them go out and get one voter registration card between the two of them, I asked Joel Williams, who is black, if I could train. One of the persons I trained, even though he didn't really need a lot of training was Justin Everett. Justin went on to register another 2000 people, or close to it. I managed, as stated above, to register about 500 people. And the people I took out on trainings registered another 3000 people and that's a conservative estimate. (See Exhibit Four, Justin's Statement to the EEOC)

6. Joel Williams then left and went on to take another opportunity. Our office had been doing well, from what I had seen and from what I had been told, and we were leading the state on some days. The office was 95 percent black and there were only a handful of white workers. I believe that was the situation in the middle of July 2016. (See Joel Statement, where he says we had registered 12500 voters by the time he left or Exhibit Three)

7. Zachary Reider then took over sometimes in July. Reider is white, about 19 then I think, and from Idaho and apparently knew nothing

2.

about Pittsburgh politics or the laws surrounding voter registration in Pennsylvania. Being that I was a manager other black canvassers would walk up to me and immediately complained that Zachary was abrasive and condescending. I withheld judgment on that until I could see his leadership style for myself. And after doing that it seemed to me that the complaints about Zachary were correct. He seemed to be both fearful and contemptuous of the mostly black staffers who worked in the office. Possibly a credibility determination here. (See Exhibit Four or even the Joel Bracy Declaration in Justin Everett's federal case, not included here.)

8. It should be pointed out that not just African Americans found Zachary Reider to be racist. A white colleague of mine, Frank Carr, who I had worked with on various campaigns, and who also found himself in Zach's noxious presence as an employee that summer as well, also found Zach to be a racist and uncomfortable around the mostly black staff. Both me and Frank, who were both former canvass directors, thought that Zach was the worst canvass director we had ever seen. Hoping to get a formal statement from Frank for Discovery.

9. It should be noted that because Republicans and some Democrats were uncomfortable with ACORN registering lots of low income and black voters, that there was a state law passed that made quotas for voter registration drives illegal. That law has never been overturned. Former ACORN head Maryellen Hayden failed to do so. (Exhibit Six: New York Times Story detailing failed attempt.)

10. I had a tense email exchange with Zachary Reider on July 18th 2016 where it was clear to me that Zach Reider not only didn't know about the history of how ACORN was destroyed over its voter registration quota system but that he didn't really care. But he did seem to agree that this was a reality once I showed him the news articles and the exact statute that was involved. I was definitely worried that he was going to fire black canvassers illegally over quotas, which is exactly what he did later with Heather Houston and Maria Carey. (See 4-2-2019 amended complaint with some emails attached, not included here.)

11. On my last day of work, July 20th, 2016, I spoke before the group before we went out to work. This was a common occurrence by the way and in no way unusual or "disruptive". I mentioned two things. One that I canvassed someone who processed voter registrations for Allegheny County and that if we let the social security number blank on the application that those voter registrations would be accepted. I also told the staff about the law against voter registration quotas in Pennsylvania. Even though Zach said in his emails that he agreed with me I simply didn't trust Zach not to fire black workers illegally over quotas. I wasn't being disruptive in any way. I, in fact, was thanked by other black workers for telling them those things. I said that publicly to protect not only Fieldworks, and black staffers, but also Zach. I then went to work. (See Exhibit Four again.)

12. After I got back to the office I was fired for being disruptive. Keep in mind that I wasn't so disruptive so that I couldn't work a full day and get 16 voter registration cards but, yeah, sure. And yes I do think this was retaliation for trying to protect black workers. Justin Everett will also testify that I was never disruptive unless knowing about state law and local politics is somehow "disruptive". This would also seem to be in violation of the state's Whistleblower Act. (See Exhibit Four again.)

13. I was never given any orders, about anything, by Zachary Reider, I only worked for him for a few days. So, therefore, I couldn't be insubordinate. It should be noted that Fieldworks shifted their explanation from being "disruptive" on my day of termination to telling the EEOC that I was insubordinate. I'm still trying to figure out how. I was a gung ho manager who loved his job and had single-handedly registered 500 people. No one had to tell me to work harder. (See Exhibit Four)

14. It should be pointed out that the thing I was warning Zach Reider about in my emails, being raided by local District Attorneys or the Attorney General, actually happened. In fact, it happened twice. The court can read those articles here (See exhibit seven.):

https://www.philly.com/philly/news/politics/20161104_Meehan_claims__criminal_conspiracy__in_Delco_voter_registration_probe.html

And here:

https://www.philly.com/philly/news/politics/20161101_State_raids_Delco_offices__seeking_evidence_of_voter_registration_fraud.html

It should be pointed out that the Attorney General then was a Democrat appointed by Democrat Tom Wolf. If you read the articles, then you notice that he's adopted the position that enforcing quotas was in violation of the state's voter registration law, just as local DA Stephen Zappala had concluded about 20 years ago with ACORN.

15. About five African Americans that I know of, including myself, filed EEOC complaints against Fieldworks and Zachary Reider. Those names include Justin Everett, Joel Bracy, Heather Houston and Maria Carey. It should be pointed out that even though I told Zach that using quotas was illegal, he fired, according to them, and I know this because I helped prepare their EEOC complaints, Houston and Carey for not maintaining a 15 voter registrations per day average. We later found out that two white canvassers that I know, Ruth Alexander and Frank Carr, had quotas that were much lower than that, about 10. (See Exhibits Five and Eight, Ruthann's press statements.)

You can read Ruthann's story here:

https://www.philly.com/philly/news/politics/20161105_Ex-canvasser__FieldWorks__boss__didn_t_really_care_how_we_got_our_quota_.html

16. The federal judge just ruled that there are material facts that can be disputed in my colleague's Justin Everett's federal case. It should be pointed out that while I applaud Justin's efforts that my case is probably stronger than his. Fieldworks is at least proclaiming something specific that Justin may have done that cost him his job,

5

such as producing duplicate voter registrations. (Which they have never proven which is odd being that we had to take photos of all of our voter registrations. We're still waiting for proof of that after several years.) I'm still trying to discover how a disruptive person is sent off to work and how I can be insubordinate when I was never given any orders. (See Exhibit Nine: 4 24 19th Order of Peter Phipps)

17. After I left Fieldworks, I went to a work for a voter contact firm. Their base pay was 15 dollars an hour. I was immediately promoted at that job as well to a field manager, where I made 18 dollars an hour. It's almost like I'm really good at canvassing. Managers never said that I was disruptive in any way. They were also black.

## One Big Issue of Triable Material Fact

18. Defendants have argued that I was "disruptive" at the morning meeting of July 20th. Only one white person states this and that's manager Zachary Reider. It also fails the common sense standard in that he sent me off to work after being "disruptive". But the important thing is that none, and I mean, none of the 30 or so African Americans who were at the meeting, agreed with this assessment of what I said. I already have a statement from Justin Everett saying just that and once we get a list of who was there that day I'll probably have about 10 more after Discovery is completed. We believe that this is a triable material fact. We believe, also, that this is credibility determination that precludes summary judgment. A jury should get to decide who's telling the truth about the events of that day: the one white teenager from Idaho, where white supramacists tend to migrate, or every other black person in the room. They might decide for the white teen but that choice should be presented to them. Is the person who sent the "disruptive" person off to talk to 100 to 200 strangers on behalf of the company "credible"? Let a jury decide.

Respectfully Submitted,

Philip Shropshire
5 16 2019

6